# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **GARY WAAG,**      ) <br><br>      **Plaintiff,**    ) <br><br>       **v.**        ) <br><br> **SOTERA DEFENSE SOLUTIONS, INC.,**   ) <br><br>      **Defendant.**   ) | **Case No. 1:14cv1715** <br><br> **(Assigned Hon. T. S. Ellis, III)** <br><br> **Hearing:  October 18, 2015** <br> **Time:  4:00 pm** |

**GARY WAAG,**

       **Plaintiff,**

       **v.**

**SOTERA DEFENSE SOLUTIONS, INC.,**

       **Defendant.**

**Case No. 1:14cv1715**

**(Assigned Hon. T. S. Ellis, III)**

**Hearing:  October 18, 2015**
**Time:  4:00 pm**

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................................3

    I.     Sotera and Potomac Fusion.................................................................. 3

    II.    Plaintiff's Employment. ..................................................................... 4

    III.   NexGen. .............................................................................................. 6

    IV.   Plaintiff's Injury And Medical Leave. ................................................ 9

    V.    Plaintiff's Return From Medical Leave And New Assignment........... 12

    VI.   Sotera's Financial Difficulties And Plaintiff's Layoff........................ 14

    VII.  Plaintiff's Claims. .............................................................................. 16

ARGUMENT ............................................................................................................17

    I.     The Applicable Summary Judgment Standard. ................................... 17

    II.    Plaintiff's FMLA Interference Claims Must Be Dismissed With Prejudice. ....... 17

          A.    Plaintiff Had No Absolute Right To Reinstatement To His NexGen Position. ............................................................. 18

          B.    Plaintiff Was Reinstated To An Equivalent Position Following His Return From Medical Leave. .......................... 19

          C.    Plaintiff's Termination Did Not Violate The FMLA.............................. 20

CONCLUSION..........................................................................................................23

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adams v. Anne Arundel Cnty. Public Schools*, 789 F.3d 422 (4th Cir. 2015) ...................17

*Breeden v. Novartis Pharmaceutical Corp.*, 646 F.3d 43 (D.C. Cir. 2011) ......................19

*Csicsmann v. Sallada*, 211 Fed. Appx. 163, 166 (4th Cir. 2006) ......................................19

*Perry v. Mail Contractors of Am., Inc.*, 589 Fed. Appx. 617, 618 (4th Cir. 2014) ...........21

*Laing v. Fed. Express Corp.*, 703 F.3d 713 (4th Cir. 2013) ..............................................21

*Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541 (4th Cir. 2006) ...............18, 22

*Zuckerman v. Wal-Mart Stores East, L.P.*, No. 15-1040, 2015 U.S. App. LEXIS
    11563 (4th Cir. Jul. 6, 2015) ......................................................................................17

### FEDERAL STATUTES AND RULES

29 C.F.R. § 825.215 .................................................................................................19, 20

29 U.S.C. § 2601 *et seq*............................................................1, 4, 17, 18, 19, 20, 21, 22

Fed. R. Civ. P. 56 ........................................................................................................1, 3

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| GARY WAAG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14cv1715 |
| | ) |
| SOTERA DEFENSE SOLUTIONS, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANTS MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Sotera Defense Solutions, Inc., (hereinafter "Sotera"), by its attorneys, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Gary Waag ("Plaintiff") has sued Sotera for alleged interference with his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, but his claims must fail with prejudice. Plaintiff does not claim in his Complaint that Sotera prevented him from taking necessary medical leave or that he was not allowed to return to work. He claims only that he was not reinstated to his same or an equivalent position when he returned, and that his employment subsequently was unlawfully terminated.

The undisputed facts show otherwise. Plaintiff was not reinstated to his previous position, SSES NexGen Program Manager, because at the time of Plaintiff's return to work, this position essentially no longer existed as a full-time position. The position depended on government funding that did not come and showed no sign of coming any time soon. Due to the ongoing effects of the sequestration imposed by Congress, task orders were not being issued

under the NexGen contract at that time.  This necessarily impacted the SSES NexGen Program Manager position – as the primary responsibility of that position was to pursue and win such tasks orders for Sotera, a business development function.  Another manager nominally filled the position, but was able to do so only because while assuming the substantially reduced program manager responsibilities related to the NexGen contract, he also continued to perform the responsibilities of his primary position, which entailed working on several other projects.  These combined responsibilities kept him busy and enabled him to be fully employed.  Plaintiff, in comparison, had no other primary position or other projects, and his former position as NexGen program manager position would not have enabled him to be employed full-time.  Consequently, Plaintiff was transferred to an equivalent position – Senior Director of Electronic Warfare Programs/Modeling & Simulation ("EWP/M&S") – to capitalize on his background and abilities. His new position undisputedly had the same salary and benefits, same Vice President reporting structure, and also had similar duties and required similar skills.

Plaintiff was laid off six weeks after he returned from his medical leave, but not because he had taken leave or because he held a new position.  He, as well as many other Sotera employees, were laid off due to the severe impact of sequestration on Sotera's business. Because Sotera was not receiving necessary government funding and did not meet its budget, it was in danger of defaulting on its bank loan covenants and was required to lay off a percentage of the workers in Plaintiff's division, especially overhead employees like Plaintiff, regardless of whether they had taken leave and regardless of what their job title was.  Plaintiff would have been laid off even if he had not taken leave and even if he had not switched jobs.  Consequently, Plaintiff's claims fail and must be dismissed in their entirety with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### I.     Sotera and Potomac Fusion.

1.     Sotera is a defense contractor that provides advanced technology products, systems, services, and advice to the United States Department of Defense.  [Complaint, ¶ 4].

2.     At all times relevant to this lawsuit, Sotera was owned by a private equity firm called Ares.  [Deposition of Gary Waag ("Plf. Dep."), p. 120].

3.     Sotera acquired Potomac Fusion, Inc. ("Potomac Fusion") on December 31, 2011.  [Deposition of Daniel Haug ("Haug Dep."), pp. 15-16; Plf. Dep. p. 73].

4.     Potomac Fusion had been founded in Chantilly, Virginia by Daniel Haug and three others in 2002 as a software engineering and development contractor for the Army.  Haug was the President of Potomac Fusion.  [Plf. Dep. p. 50;  Haug Dep. pp. 13-17; Declaration of Daniel Haug ("Haug Dec.") ¶ 3].

5.     Although Potomac Fusion (then operating as Potomac Fusion, LLC)  was wholly owned by Sotera and was treated as a business unit of Sotera from an operations standpoint, it remained a separate legal entity for tax reasons.  In 2013, however, Potomac Fusion became the Data Fusion and Analytics ("DFA") division of Sotera and Potomac Fusion employees' paychecks came from Sotera for the first time.  Haug became the Vice President in charge of the DFA unit.   [Plf. Dep. pp. 85-86, 151-52; Haug Dep. pp. 16-18; Haug Dec. ¶ 3].

6.     Potomac Fusion's human resources policies, including its leave policy, were accessible to its employees online.  Sotera's human resources policies contained in its employee handbook were also accessible to its employees online.  [Plf. Dep. pp. 88-89].

---

[1]  The following facts are supported by appropriate citation to depositions, deposition exhibits, interrogatory responses, affidavits, and other admissible evidence as to which Sotera contends there are no genuine issues.  The facts are viewed in the light most favorable to non-movant Plaintiff as required by Fed.R.Civ.P. 56.  The cited materials and any unreported authority are contained in a separate Appendix filed contemporaneously with this brief.

7.     Sotera's Family Medical Leave Policy, to which Plaintiff had online access, states in relevant part as follows:

> It is the policy of the Company to grant up to twelve (12) weeks of family and medical leave per rolling twelve (12) month period to eligible employees, in accordance with the Family and Medical Leave Act of 1993 (FMLA).   The leave may be paid (if the employee uses their PTO), unpaid, or a combination of paid and unpaid, depending on the circumstances.
>
> ***
>
> With limited exceptions, an employee who takes leave under this policy will be able to return to the same job or a job with equivalent status, pay, benefits, and other employment terms.  The position will be the same or one which entails substantially equivalent skill, effort, responsibility and authority.  If layoffs or a reduction-in-force occurs while an employee is on family or medical leave and if the employee's position would have been lost had the employee not been on an approved FMLA leave, the employee loses his or her right of reinstatement.

[Plf. Dep. pp. 94-95, 222; Plf. Dep. Ex. 22].

**II.     Plaintiff's Employment.**

8.     In Summer, 2011, Plaintiff contacted Haug looking for work.  At the time, Potomac Fusion was growing rapidly and Haug was looking for a deputy.  Haug also was interested in hiring Plaintiff because he had a significant background in modeling and simulation ("M&S").  In their correspondence, Plaintiff indicated that he would be interested in doing M&S business development for Potomac Fusion.  Specifically, Plaintiff told Haug:

> Although you acknowledged that your footprint in the Intel M&S world was small and not a principal thrust of the organization, if you were interested in someone taking on the [business development] role of trying to grow that footprint, even as a part-time role in addition to other duties, that would definitely interest me."

[Plf. Dep. pp. 31, 33; Haug Dec. ¶ 4; Haug Dec. Ex. A].

9.      Plaintiff started at Potomac Fusion the first Monday in October 2011.  His title at the time of hire was Director of National Intelligence Programs, although the title later was changed to Director of Operations, National Intelligence Programs because another employee already had the former title.  [Plf. Dep. pp. 42, 48, 50, 54, 66].

10.     For the first year of his employment, Plaintiff's primary job function was to serve as Haug's deputy and to perform a broad range of assignments for Haug on an as-needed basis. [Plf. Dep. pp. 60-61; Haug Dec. ¶ 5]

11.     For the first three to six months of his employment, Plaintiff's job duties included (1) functioning as a program control analyst managing the budget for projects; (2) helping to define and institute more formal mechanisms for program controls and management – a standardization process; and (3) supporting business development efforts to position and grow the footprint of the company.  [Plf. Dep. pp. 67-72; Haug Dep. p. 20].

12.     Once the sale of Potomac Fusion to Sotera was announced, Plaintiff maintained the same job title and assisted Haug with operations for the DFA unit.  This included oversight of recruiting, security, information technology, and facilities.  It also included "not very exciting work" and "[f]airly mundane work," such as reviewing orders for break room snacks to make sure expensive snacks were not ordered.  [Plf. Dep. pp. 73, 115-16; Haug Dep. p. 21].

13.     However, after Potomac Fusion's acquisition, these functions were gradually integrated into Sotera and Haug no longer required Plaintiff's assistance with them. Accordingly, Haug began transitioning Plaintiff into the business development role in M&S for which he originally had been hired.  Specifically, he sent Plaintiff to a multi-day seminar on M&S in Orlando in September, 2012, where Plaintiff was expected to ramp up his M&S business development efforts.  Haug had Plaintiff and a consultant prepare a plan that dealt with

5

ramping up the business development efforts in M&S.  [Plf. Dep. pp. 240-244; Haug Dec. ¶ 7; Haug Dec. Ex. B].

14.    At the time Sotera acquired Potomac Fusion, management identified the key Potomac Fusion employees and entered into retention bonus agreements with them.  Plaintiff was not included in this list because he was not deemed critical to the strategic growth of the company or significant value added.  [Haug Dec. ¶ 5].

15.    The defense contracting industry has two general types of employees: direct and indirect.  Direct employees work on specific government contracts and their wages are billable, meaning they are essentially directly paid for by government funding on a particular contract. Management and staff employees, like Haug and Plaintiff, are called indirect or overhead employees.  Their salaries and benefits are paid out of the company's overhead, which is funded through the overhead fees defense contractors charge the government on its billing for direct employees.  [Haug Dec. ¶ 5].

16.    At no time during his employment did Plaintiff perform any direct billable work on any contract for the company.  Plaintiff's position was part of the company's overhead and his job was to support Haug in the daily management of the business.  [Plf. Dep. p. 49; Haug Dep. pp. 19-20].

**III.    NexGen.**

17.    In September, 2012, the Army announced that Sotera had been named as a prime contractor for SSES NexGen ("NexGen").  The purpose of NexGen was to develop war fighting software for the Army at Aberdeen Proving Ground in Maryland.  [Plf. Dep. pp. 62, 108, 159-60; Haug Dep. pp. 35-36; Declaration of Kathleen Lossau ("Lossau Dec."), ¶ 4].

18.     NexGen was an "IDIQ" contract, meaning an "indefinite delivery, indefinite quantity" contract.  A contractor who wins an IDIQ contract does not win any government

funding and is not awarded any contracts for specific projects. An IDIQ contract merely gives contractors the right to bid on future task orders the government might issue under that contract. An IDIQ is "basically a hunting license so that you can go after task orders." "There were no programs associated with it." [Plf. Dep. pp. 25-26, 149; Deposition of Devin Edwards ("Edwards Dep."), p. 58; Lossau Dec. ¶ 4].

19. A program manager of an IDIQ contract has no clients and no funding, so he or she consequently has no staff. Additionally, his or her salary is an overhead expense to the company until task orders have been won. [Plf. Dep. pp. 153, 186].

20. Plaintiff was familiar with the unpredictable and sometimes fruitless nature of IDIQ contracts because he had worked on them for a previous employer, L-3. In that role, Plaintiff saw program managers being moved to new roles because the IDIQ contract produced very little work and did not generate enough revenue to cover costs. In fact, L-3 did not have the funding to cover Plaintiff's salary in the role. Plaintiff left L-3 because of boredom and stagnation because there is very little work to do when there are no task orders. In September, 2011, Plaintiff told Haug that "[o]ne of the reasons why I started casually looking for another position several months ago was that this IDIQ has been a dog, as very little work has come out on it." [Plf. Dep. pp. 37, 77-80; Plf. Dep. Ex. 6; Haug Dec. ¶ 4; Haug Dec. Ex. A]. Plaintiff further testified that because the funding for his L-3 IDIQ stalled, L-3 couldn't afford to pay his salary much longer and that he knew his job would be eliminated in the coming year. [Plf. Dep. pp. 29-30]

21. In early October, 2012, Haug and Vice President Kathleen Lossau asked Plaintiff to be the program manager for the NexGen IDIQ contract for Sotera. Plaintiff agreed to do so. [Plf. Dep. pp. 108, 152-53; Haug Dep. p. 38; Lossau Dec. ¶ 4].

7

22.     A large part of the job duties for the NexGen contract, and for IDIQ contracts in general, is business development.  Contractors who wait to understand their customers until a task order comes out are generally too late because they do not have a sufficient understanding of their customers' needs to prepare winning proposals.  They must be developing business from their client before that point by cultivating relationships.  [Plf. Dep. pp. 153-55].

23.     Another job duty for the NexGen contract involved coordination of subcontractors, although such coordination does not begin until after the kickoff of the project. The NexGen kickoff was delayed from October, 2012 until late November, 2012 because of weather issues.  For the short time Plaintiff worked on NexGen, Plaintiff focused on business development by reaching out to government contacts to understand who might use the contract. [Plf. Dep. p. 155-57].  A program manager on a Sotera IDIQ does only internal coordination within Sotera until there is a government kickoff meeting.  [Edwards Dep. p. 68].

24.     With an IDIQ, the program manager's salary is not directly billable to the client. In fact, until a task order is won, every cost on an IDIQ is nonbillable.  A contractor's business development personnel is not directly billable to the government, but is an overhead expense. Haug told Plaintiff the NexGen job was a business development job.  [Plf. Dep. pp. 178-79; Haug Dep. pp. 98-100; Lossau Dec. ¶ 4].

25.     Initially, no task orders associated with the NexGen IDIQ came in.  [Plf. Dep. p. 160].

26.     Plaintiff had no employees reporting to him in his role as NexGen program manager, although he was trying to position Gerald Watson to be his deputy.  [Plf. Dep. p. 271].

27.     After Plaintiff was asked to perform the NexGen program manager role, he asked Haug and Lossau for a raise from $175,000.00 to $200,000.00.  Although Haug initially agreed,

Lossau indicated that she wanted Plaintiff to earn his raise to $200,000.00 by giving him an immediate raise to approximately $190,000.00 and allowing him to earn the remainder through hitting performance goals.  [Plf. Dep. pp. 171-73].

28.     Shortly thereafter, Lossau changed her mind and decided that she did not wish to grant Plaintiff a raise.  Plaintiff told Lossau he would not have taken the job if he had known he would not receive a raise, and Lossau considered and finally decided to grant Plaintiff a raise.  [Plf. Dep. pp. 185-89; Plf. Dep. Ex. 16].

**IV.     Plaintiff's Injury And Medical Leave.**

29.     Within just a few days of transferring into the NexGen program manager role, Plaintiff fell off his roof and severed his hand on October 17, 2012.  [Plf. Dep. pp. 184, 195-96; Haug Dep. p. 48].

30.     Plaintiff was hospitalized for several days and subsequently required two to three days of physical therapy per week in November and December 2012 and beyond.  His physician indicated that he would be off work from October 17, 2012 until December 31, 2012.  [Plf. Dep. pp. 198, 201, 204-05, 219].

31.     Plaintiff informed Haug of his injury the day it occurred.  The company was aware that Plaintiff would be off work while he recovered.  [Plf. Dep. pp. 195-96, 199; Haug Dep. p. 50].

32.     Plaintiff completed paperwork to apply for short term disability leave and his request was approved.  He subsequently took medical leave in the form of paid time off and short term disability, which paid part of his salary while he was on leave.  [Plf. Dep. pp. 199, 217-18].

33.     During his leave, several people at Sotera reached out to Plaintiff and wished him well.  Haug was sympathetic to Plaintiff.  No one ever said anything negative to Plaintiff regarding his injury or his medical leave.  [Plf. Dep. pp. 206-07].

34.     Although Plaintiff offered to perform some of his job duties while on leave, he was told that he needed to stay home and heal.  [Plf. Dep. pp. 216-17].

35.     Plaintiff and Lossau communicated about NexGen several times while he was on medical leave.  In an October 21, 2012 email, Plaintiff acknowledged that Lossau "recognized I am severely limited in my ability to step out into the SSES NexGen Project Manager role."  On October 29, 2012, Plaintiff stated that he could not drive, had difficulty even riding in a car as a passenger, and that he was in considerable pain.  [Lossau Dec. ¶ 6; Lossau Dec. Ex. A].

36.     During Plaintiff's leave, Devin Edwards, who was Director of Mission Analytics and Collection working out of the Columbia, Maryland facility at the time, assumed responsibility over the NexGen IDIQ and maintained it as an area of responsibility after Plaintiff returned to work in January, 2013.  Haug told Edwards that "[t]here's nothing for you to do right now" on the NexGen IDIQ because there had been no kickoff and there were no task orders, so there was no identified work to pursue on the IDIQ.  Edwards continued to perform his many other business duties managing active revenue projects and other business development and software engineering duties during this period; he only devoted 10 to 20 percent of his time to NexGen, as no task orders were issued for the project in 2012 or 2013.  In all, Edwards managed nine other activities for Sotera outside of NexGen.  [Plf. Dep. pp. 208-10, 229, 273; Haug Dep. pp. 77, 106-08; Haug Dec. ¶¶ 9, 10; Edwards Dep. pp. 46, 56, 66-68, 77-78].

37.     In a series of emails in November 2012, Lossau explained to Plaintiff that it was critical to have Edwards as the NexGen program manager because it was unclear how long Plaintiff would be out and he would miss the government's kickoff meeting and the preliminary work that preceded the kickoff meeting.  Plaintiff suggested three different paths forward: (1) that Edwards fill the NexGen program manager position temporarily during his absence; (2) that

Edwards stay on as the program manager and that Plaintiff assist him when he returned; or (3) that Plaintiff have no further role on NexGen and that he be placed in a new position.  Lossau reminded Plaintiff, "[y]ou have been in this business long enough to know that no position is permanent."  She also explained, "[d]on't worry about your position.  All will work out." Lossau continued that "we will evaluate as we ease you back into full time work when you are ready" and that "together we will figure out what roles work best for all involved."  [Lossau Dec. ¶ 7; Lossau Dec. Ex. B].

38.     In October, 2012, while Plaintiff was on leave, a government sequestration was announced.  Sequestration stops the fulfillment of most government contracts, and during the sequestration period there is no funding for task orders.  Haug received feedback from Edwards, who attended the NexGen kickoff in November, 2012, that "none of this was going to happen any time soon" and that "there was no money."  [Plf. Dep. pp. 230-31; 276; Haug Dep. pp. 105-07; Haug Dec. ¶¶ 8, 10].

39.     Lossau also attended the NexGen kickoff.  Prior to the meeting, management was hopeful that the NexGen IDIQ would be an immediate funding source for Sotera.  Government officials at the kickoff made clear that requests for proposals were many months away or more from being issued, and that sequestration would halt any progress in the near term for funding for NexGen.  Although the Powerpoint deck prepared by the government for the kickoff meeting contains possible dates for issuing task orders as early as February, 2013, the government clarified that the NexGen task order dates were simply placeholders and were not realistic because there was no funding for NexGen for the foreseeable future.  [Lossau Dec. ¶ 8; Lossau Dec. Ex. C].

40.     As a result of the government sequestration, there were no task orders associated with the NexGen contract in all of 2013.   The government did not issue its first task order requests for proposals until February 2014, and Sotera did not win its first task order on the project that produced billable work until June 2014.    [Plf. Dep. p. 276; Haug Dep. pp. 106-07; Haug Dec. ¶ 10; Lossau Dec. ¶ 8].

**V.     Plaintiff's Return From Medical Leave And New Assignment.**

41.     Prior to Plaintiff's return to work, Haug was briefed by Human Resources.  He was counseled that when Plaintiff returned from leave, he should be restored either to his same position or to an equivalent job.  Haug was provided an explanation of what an equivalent job is. [Haug Dep. pp. 53-55].

42.     When Plaintiff informed Haug that he would be returning to work, Haug was tasked with finding an equivalent position for him that would make the best use of his skill sets. Haug could not return Plaintiff to the NexGen project because there was so little activity on the contract and there would need to be more activity before Haug could assign Plaintiff the work. [Haug Dec. ¶ 12].

43.     On or about December 26, 2012, Haug met with Plaintiff and told him that when he returned, he would report to Vice President Jim Gerard in a new Electronic Warfare Progarm ("EWP") and Modeling and Simulation ("M&S") division.   On December 31, 2012, Haug emailed Plaintiff and Gerard and confirmed that Plaintiff would report to Gerard.  [Plf. Dep. pp. 227-28; Haug Dep. pp. 60-61; Haug Dec. ¶ 12; Haug Dec. Ex. D; Lossau Dec. ¶ 9].

44.     Modeling and simulation was important to Sotera, and Gerard was hired as a Vice President to develop a strategy for growing an electronic warfare business.   The focus of the M&S division was business development planning in M&S.  If Sotera won the electronic warfare

program management trainer ("EWPMT") proposal Gerard was brought in to work on, they could earn $70 to $80 million.  [Plf. Dep. pp. 143-145; Haug Dec. ¶ 7; Lossau Dec. ¶ 9].

45.     Plaintiff was assigned to the EWPMT proposal because he had related experience with his background in M&S.  In fact, he was an elected member of a group that organized a regular semiannual M&S conference.  Plaintiff had attended the conference for years, and in September, 2012, Haug paid the expenses for Plaintiff to attend the conference in Orlando to ramp up his business development efforts in M&S.  [Plf. Dep. pp. 235-38; 240-42].

46.     One of Plaintiff's new duties was to develop business for the M&S division.  Plaintiff had contacts in the M&S world.  The plan was for Plaintiff to develop his network of M&S contacts in the defense community.  [Plf. Dep. pp. 243-45].

47.     Plaintiff emailed Haug on December 31, 2012 and indicated that he was "excited about diving into this" and thanked him for "carving out a new role for [him]" as he returned to work.  [Haug Dec. ¶ 12; Haug Dec. Ex. D].

48.     Plaintiff spent a significant amount of time helping to write a proposal for EWPMT that was submitted in early February, 2013.  His duties were significant and were similar to the work done by other directors and senior directors at Sotera.  [Haug Dec. ¶ 11].

49.     Plaintiff's duties in his EWP/M&S role were consistent with the duties Edwards had on NexGen, though far more urgent since there was extremely little activity on NexGen because there were no government task orders.  [Haug Dec. ¶ 12; Lossau Dec. ¶ 9].

50.     Plaintiff was paid the same salary and benefits in his EWP/M&S role that he was paid in his NexGen role.  Additionally, he still reported to a vice president.  Plaintiff even had retired Coast Guard captain Dennis Mitchell reporting to him in the EWP/M&S role.  No employees reported to him in his NexGen role.  [Plf. Dep. pp. 268-69, 271; Haug Dec. ¶ 12].

13

VI.    **Sotera's Financial Difficulties And Plaintiff's Layoff.**

51.    Sotera's forecasted revenue for Fiscal Year 2012 was $469 million.  However, revenue slowed sharply due to the government sequestration, and Sotera's actual revenue for Fiscal Year 2012 was only $359 million.  Sotera had loans of approximately $180 million, and its declining profits failed to meet the minimum required by the covenants for Sotera's loan agreements.  [Plf. Dep. p. 266; Haug Dec. ¶ 12; Declaration of Jennifer Felix ("Felix Dec."), ¶¶ 6, 7].

52.    By January, 2013, it was clear that Sotera needed to cut costs to avoid violating its loan covenants, or Sotera might go out of business.  The decision was made to cut layers of overhead, particularly out of the DFA business unit, which had the most overhead of any division in the company.  The decision was made not to cut direct, billable employees because they could still produce revenue.  The primary cuts would come from indirect or overhead employees that were not directly billable to the government.  Cuts also came from bonuses, travel, training, recruiting, and a hiring freeze.  [Plf. Dep. pp. 266, 268; Haug Dec. ¶ 13; Felix Dec. ¶¶ 4, 8].

53.    The DFA division had overhead labor expenses of $2.9 million in early 2012, but by the end of 2012, this expense had bloated to $4.9 million.  These were the highest indirect costs of any division, and DFA was especially under pressure because of these costs and because of its underperformance.  The decision was made to cut $2.3 million in overhead costs from DFA to help make the company profitable.  [Plf. Dep. pp. 266, 268, Haug Dec. ¶ 12; Felix Dec. ¶ 9]. The layoff of several indirect or "overhead" employees was necessarily a part of this decision.

54.    Haug made the decision to lay Plaintiff off with input from Lossau, Senior Vice President Bill Cave, and Senior Vice President and Head of H.R. Lisa Broome.  [Plf. Dep. p. 266; Haug Dep. pp. 64-65; Haug Dec. ¶ 14].

55.     Haug's decision to select Plaintiff for layoff was because: (1) Plaintiff was not performing any direct billable work; and (2) managers working in DFA's INSCOM GIS and TIES groups were working on projects that were deemed to be higher priority than the M&S and EWPMT initiatives Plaintiff was working on.  [Plf. Dep. pp. 266, 268; Haug Dec. ¶¶ 13, 14; Felix Dec. ¶ 10].

56.     The decision to lay off Plaintiff was not made until February, 2013.  [Plf. Dep. p. 266; Haug Dep. pp. 62-63].

57.     The layoffs were rolling; they began in January 2013 and continued throughout 2013. They also did not stop with Plaintiff.  [Plf. Dep. p. 267; Haug Dec. ¶ 14].

58.     Haug decided not to lay off Edwards, despite the fact that NexGen had stalled at the time, because he was critical to a number of Sotera's other significant revenue programs.  He was a major success factor in many business development areas within Sotera and was even named project manager of the year in 2013.  Haug simply considered Edwards more vital than Plaintiff to the organization, for reasons unrelated to NexGen. [Haug Dec. ¶ 14].

59.     Haug begain 2013 with 25 management overhead reports, including Plaintiff.  As part of the series of rolling layoffs, Haug laid off numerous director and senior director employees, along with Gerard, a Vice President, who was laid off after his EWPMT proposal had been lost.  All of the laid off managers were laid off due to lack of business to support their overhead costs.   Other managers voluntarily resigned due to the financial condition of the company and were not replaced with new hires.  As of November 2013, Haug had only 11 senior managers remaining out of the group of 25 senior managers in overhead that he started with in 2013.  As this process continued, the DFA division was rolled into the company and no longer

exists.  Of the 250 employees who originally came from Potomac Fusion, Haug estimates that fewer than 50 are still employed by Sotera.  [Plf. Dep. pp. 267-68; Haug Dec. ¶¶ 15, 16].

60.     In November, 2014, Haug resigned in lieu of being laid off himself.  [Haug Dec. ¶ 3].

**VII.   Plaintiff's Claims.**

61.     Plaintiff claims Sotera interfered with his rights pursuant to the Family and Medical Leave Act ("FMLA") because he was not reinstated to his former position following a medical leave; because he was not placed in a position equivalent to his former position following his medical leave; and because his employment was terminated as a result of taking a medical leave [Complaint, Counts I and II].

62.     Plaintiff admits that he did not know that government sequestration began while he was on his medical leave, and admits that he is unaware of the effects of sequestration on the Army's funding of NexGen.  [Plf. Dep. pp. 230-31, 276].

63.     Plaintiff admits that NexGen was an IDIQ contract, and that although the contract was "potentially" lucrative, it was worth "nothing" until the contractor won task orders.  He further admits that he did not know that the first task orders did not come in on NexGen until 2014.  [Plf. Dep. pp. 229-30, 260].

64.     Plaintiff admits that he knew Sotera did not meet its financial goals for Fiscal Year 2012 and that Ares was displeased with Sotera's financial numbers.  [Plf. Dep. p. 266].

65.     Plaintiff admits that he has no knowledge that Haug was given a directive to cut labor costs in January and February, 2013, and that he is not aware of any of the analysis or reasons behind his layoff.  He did not know if there were position eliminations or economic reductions.  [Plf. Dep. pp. 266, 268].

## ARGUMENT

### I.      The Applicable Summary Judgment Standard.

"A district court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Zuckerman v. Wal-Mart Stores East, L.P.*, No. 15-1040, 2015 U.S. App. LEXIS 11563, at *2 (4th Cir. Jul. 6, 2015) (internal quotation omitted).  The Court will "view the facts and all justifiable inferences arising therefrom in the light most favorable to … the nonmoving party." *Id.*  "However, conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the nonmoving party's case." *Id.* at *3 (internal quotation omitted).

### II.     Plaintiff's FMLA Interference Claims Must Be Dismissed With Prejudice.

Plaintiff's two counts allege interference with his FMLA rights.  Specifically, Plaintiff claims he was not reinstated to his former position following a medical leave (Count I); that he was not placed in a position equivalent to his former position following his medical leave (Count II); and that his employment was terminated as a result of taking a medical leave (Counts I and II).  Notably, he does not (nor could he) claim that Sotera prevented him from taking medical leave or from returning to work following his leave.

To establish his FMLA interference claims, Plaintiff must establish: (1) he was entitled to an FMLA benefit; (2) Sotera interfered with the provision of that benefit; and (3) Sotera's interference caused him harm.  *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015).  As detailed below, there is no material dispute that Plaintiff cannot establish all of these elements. Consequently, his claims fail in their entirety and must be dismissed with prejudice.

17

**A.     Plaintiff Had No Absolute Right To Reinstatement To His NexGen Position.**

Plaintiff cannot establish that Sotera violated the FMLA by failing to reinstate him to his NexGen position upon his return from medical leave on January 2, 2013, because "the FMLA provides no absolute right to restoration to a prior employment position." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 549 (4th Cir. 2006). Rather, the FMLA merely requires that upon return from a qualifying leave, an employee shall be entitled to (A) restoration to the position he or she held before the leave commenced; **or** (B) restoration to an equivalent position with "equivalent employment benefits, pay, and other terms and conditions of employment." 29 U. S. C. § 2614(a)(1) (emphasis added).

Sotera satisfied its obligation under the FMLA by choosing the second option and restoring Plaintiff to an equivalent position – that of Senior Director of Electronic Warfare Programs/Modeling & Simulation. In truth, Sotera could not return Plaintiff to his NexGen program manager job, as there was no full-time job to come back to. Due to government sequestration, there were no task orders associated with the program in 2012 or 2013, and consequently, no funding for the NexGen project. Thus, a full-time program manager's salary was an impossibility considering Sotera's dire financial condition, and the fact that it was unknown when issuance of task orders under NexGen would resume. Edwards was only able to continue in the position because it was not his primary or full-time job, and he spent only 10 to 20 percent of his time on NexGen. Even if Plaintiff had not taken a medical leave, there essentially would have been little NexGen work for him to do.[2] As discussed more in Section C

---

[2] Plaintiff is well aware of the risks associated with working on an IDIQ contract – the very reason he contacted Haug looking for a job in the first place while he was still working for L-3 was that his "IDIQ has been a dog, as very little work has come out on it." [Haug Dec. ¶ 4; Haug Dec. Ex. A].

below, Plaintiff's case must be dismissed because he would not have been able to keep the job if he had taken no leave at all.

### B. Plaintiff Was Reinstated To An Equivalent Position Following His Return From Medical Leave.

Plaintiff's claim that he was not reinstated to a position equivalent to his former NexGen job when he returned from medical leave fails because he cannot establish that his position of Senior Director, Electronic Warfare Program/Modeling & Simulation differed in any material way from that of NexGen Program Manager.  In all significant respects, the two positions were the same: they both paid the same salary and benefits, they both had a Vice President reporting structure, they both involved similar duties, and they both involved similar skills.  Significantly, the primary responsibility of both positions was *exactly* the same – business development; they merely differed as to the type of business that would be sought.  *See Breeden v. Novartis Pharmaceutical Corp.,* 646 F.3d 43, 49-50 (D.C. Cir. 2011) (employer properly reinstated plaintiff to a similar position when she was reinstated to a sales position with the same title, responsibilities, compensation and benefits, although in a different sales territory).

Plaintiff claims his EWP/M&S position was not equivalent because it was not as prestigious as his NexGen job.  The Fourth Circuit has indicated, however, that "the requirement of equivalent terms and conditions of employment 'does not extend to de minimis or intangible, unmeasurable aspects of the job.'"  *Csicsmann v. Sallada*, 211 Fed. Appx. 163, 166 (4th Cir. 2006) (quoting 29 C. F. R. § 825.215).  The plaintiff in *Csicsmann* was a Server Group Manager before he took an FMLA leave.  *Id.* at 165.  Upon returning from FMLA leave, he learned that his previous job had been eliminated and he had been assigned to a position on the Disaster Recovery Project.  *Id.*  Csicsmann claimed his new position was not equivalent to his previous job because "his new position was less prestigious and had different responsibilities than the old

one." *Id.*   However, the district court rejected his claim and the appellate court affirmed summary judgment for the employer. *Id.* at 165-66.

The Fourth Circuit held that Csicsmann's new position was equivalent because he had the same salary, title, bonus eligibility, health care, retirement benefits, schedule, and office, even though his job responsibilities differed. *Id.*at 166.   It further held that Csicsmann's allegations that the new position was less prestigious and less visible "are the very intangible aspects of the position appropriately excluded from an equivalency determination." *Id.*

Sotera similarly satisfied its duty under the FMLA and placed Plaintiff in an equivalent position.   He maintained his same salary and benefits.   He still reported to a Vice President. Plaintiff returned to work in a similar business development role in the EWP/M&S area, which (i) he was doing just prior to the NexGen assignment that lasted only a few days, and (ii) was one of the qualifications Plaintiff said he had when Haug hired him in October, 2011.   He even had more status than before – a former Coast Guard officer, Mitchell, reported to him, whereas he had no direct reports in his NexGen role.   [Plf. Dep. p. 271; Haug Dec. ¶ 12].   He worked in the same place.   All these factors indicate that Plaintiff's new position was equivalent to his prior one.   Although Plaintiff claims his EWP/M&S position was not equivalent because it was not as prestigious as his NexGen job had been, this is a subjective and intangible aspect that should not be considered in an equivalency determination.   Plaintiff cannot establish any meaningful differences between his EWP/M&S job and his NexGen job.   As such, he cannot make out a claim based on failure to restore him to an equivalent position.

## C.   Plaintiff's Termination Did Not Violate The FMLA.

Plaintiff also cannot prove that Sotera interfered with his FMLA rights by laying him off approximately six weeks after he returned from his medical leave.   He has not established any

link whatsoever between his medical leave and his layoff, and there is no evidence that the decision in any way interfered with Plaintiff's rights under the FMLA.[3]

Plaintiff was laid off because sequestration ripped into Sotera and it needed to cut overhead costs in a hurry due to serious issues with its loan covenants.  One method of coping with sequestration was to lay off employees who could not be directly billed to clients.  Sotera could not justify retaining Plaintiff under these conditions.  While Plaintiff may believe factors other than financial constraints motivated Sotera, he admittedly knows nothing about Haug's directive to cut labor costs in January and February 2013, or of the analysis or reasons behind his layoff.  In light of his admitted ignorance of these factors, any argument Plaintiff can make is pure speculation, and "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence" to defeat summary judgment."  *Perry v. Mail Contractors of Am., Inc.*, 589 Fed. Appx. 617, 618 (4th Cir. 2014).

Plaintiff's claim also fails because his employment would have been terminated regardless of whether he had previously taken medical leave.  "The FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave."  *Laing v. Fed. Express Corp.*, 703 F.3d 713, 723 (4th Cir. 2013).  "The FMLA in fact provides that nothing in this section shall be construed to entitle any restored employee to … any right, benefit, or position of employment other than one to which the employee would have been entitled had the employee not taken the leave."  *Id.* (internal quotation removed).  In short, the FMLA offers Plaintiff no immunity from the vicissitudes of the government contract industry.

---

[3] Notably, Plaintiff has not raised an FMLA retaliation claim in his Complaint, and such theory is not before the Court at this time.

21

In *Yashenko*, the plaintiff took a medical leave of absence, and while he was out, his employer reorganized and eliminated his position. 446 F.3d at 545. Consequently, the plaintiff's employment was terminated when he returned from FMLA leave. *Id.* The court affirmed summary judgment for the employer and held that the plaintiff did not have an absolute right to return to work because his employment would have been terminated even had he not taken leave. *Id.* at 548-50. "[A]n employer may deny restoration when it can show that it would have discharged the employee in any event regardless of the leave." *Id.* at 548.

Similarly, Plaintiff's layoff was inevitable considering Sotera's financial situation. He would have lost his job whether he had taken medical leave or not, so his leave does not protect him from termination. Sotera was in dire financial condition in February 2013 and it had little choice other than to utilize a reduction in force to eliminate costly overhead employees who could not be billed directly to the government. Plaintiff was not billable either in the NexGen position he filled before his medical leave or in his EWP/M&S position he filled after he returned, and he would have been a prime candidate for layoff either way. As Plaintiff made nearly $200,000.00 a year and he did not have a billable position to cover his salary, he was a natural choice for the reduction in force, regardless of his previous medical leave. Plaintiff's employment would have been terminated even if he had not taken leave, and he was not entitled to more favorable treatment because he did. The rolling layoffs in 2013 and 2014 were so deep that only a few overhead employees within DFA survived. How Plaintiff can assume he would not have been laid off under these conditions is simply not believable. Even Haug, the founder of the DFA division and the decision maker in Plaintiff's layoff, ultimately resigned in 2014 rather than be laid off by Sotera.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Sotera Defense Solutions, Inc. respectfully requests that the Court grant summary judgment in its favor, dismiss Plaintiff Gary Waag's Complaint and all its claims with prejudice, and grant Sotera Defense Solutions, Inc. such other relief as the Court deems appropriate.


Date:  September 17, 2015                    BARNES & THORNBURG LLP


                                            */s/ Teresa Lynn Jakubowski*
                                            Teresa Lynn Jakubowski, Esq.
                                            VA Bar No. 88320
                                            Devin J. Stone, Esq.
                                            VA Bar No. 88323
                                            Suite 500
                                            1717 Pennsylvania Avenue, NW
                                            Washington, DC  20006
                                            Telephone:    (202) 289-1313
                                            Facsimile:    (202) 289 1330
                                            teresa.jakubowski@btlaw.com
                                            devin.stone@btlaw.com

                                            John F. Meyers, Esq.
                                            *(admitted pro hac vice)*
                                            Prominence in Buckhead, Suite 1700
                                            3475 Piedmont Road, N.E.
                                            Atlanta, GA  30305
                                            Telephone:    (404) 264-4017
                                            Facsimile:    (404) 264-4033
                                            John.Meyers@btlaw.com

                                            *Attorneys for Defendant*
                                            *Sotera Defense Solutions, Inc.*

23

**CERTIFICATE OF SERVICE**

I certify that on September 17, 2015, I electronically filed the foregoing Defendant's Memorandum of Law in Support of its Motion for Summary Judgment using the CM/ECF system, which will automatically send electronic notification of such filing to the following attorney of record:

Martin P. Hogan
Hogan & Pritchard, PLLC
11350 Random Hills Road, Suite 800
Fairfax, VA  22030

/s/ *Teresa Lynn Jakubowski*

Teresa Lynn Jakubowski, Esq.
VA Bar No. 88320
Suite 500
1717 Pennsylvania Avenue, NW
Washington, DC  20006
Telephone:        (202) 289-1313
Facsimile:        (202) 289 1330
teresa.jakubowski@btlaw.com

CODS01 DOLDHAM 42869v3

24