**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| GARY WAAG, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 1:14-cv-1715** |
| | ) | |
| SOTERA DEFENSE SOLUTIONS, INC., | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## ORDER

The matter is before the Court on defendant's motion for summary judgment on plaintiff's Family and Medical Leave Act ("FMLA")[1] interference claims (Doc. 28). The parties have fully briefed and argued the issue, which was taken under advisement following a hearing on October 30, 2015 (Doc. 74).

This dispute arises from events that followed plaintiff's return from FMLA leave from his employment with defendant. When plaintiff returned from leave, defendant placed plaintiff in a new position and ultimately terminated him from that position. The following issues are central to resolution of defendant's motion for summary judgment:

1. Whether plaintiff has adduced competent record evidence sufficient to raise a genuine issue of material fact that defendant interfered with plaintiff's FMLA right to restoration by not restoring plaintiff to his former position upon plaintiff's return from medical leave.

2. Whether plaintiff has adduced competent record evidence sufficient to raise a genuine issue of material fact that defendant interfered with plaintiff's FMLA right to restoration by restoring plaintiff to a position that was not equivalent to plaintiff's former position upon plaintiff's return from medical leave.

---

[1] 29 U.S.C. § 2601, *et seq.*

3. Whether plaintiff has adduced competent record evidence sufficient to raise a genuine issue of material fact that defendant interfered with plaintiff's FMLA right to restoration by terminating plaintiff after plaintiff returned from medical leave or that defendant's termination of plaintiff was retaliation against plaintiff for taking FMLA leave.

## I.

The undisputed material facts in the record may be summarized as follows:[2]

1. Defendant Sotera Defense Solutions, Inc. is a defense contractor that provides advanced technology products, systems, services, and advice to the Department of Defense. Plaintiff Gary Waag is a former employee of defendant and its subsidiary, Potomac Fusion, Inc. ("Potomac Fusion"). Compl. ¶ 2-4.

2. In Summer 2011, plaintiff sought a modeling and simulation (M&S) business development position with Potomac Fusion, and Potomac Fusion hired plaintiff in October 2011 as "Director of Operations, National Intelligence Programs." Dep. of Gary Waag ("Pl. Dep.") at 42, 48, 50, 54, 66. Potomac Fusion, which was founded by Daniel Haug and three others in 2002, was acquired by defendant on December 31, 2011. Potomac Fusion eventually became defendant's Data Fusion and Analytics ("DFA") division, and Haug became the Vice President of the DFA division. Haug Dep., at 13-18; Pl. Dep. at 50, 73, 85-86; Haug Dec. ¶ 3.

3. Potomac Fusion and defendant's human resources policies, including the leave policy, were accessible to their employees online. Pl. Dep. at 88-89. Pl. Dep. at 94-95; 222; Pl. Dep. Ex. 22.

4. For the first year of his employment—both for Potomac Fusion and later for defendant's DFA division—plaintiff was Haug's deputy and performed a broad range of assignments for Haug, including (i) managing the budget for projects; (ii) helping standardize the mechanisms for program controls and management; and

---

[2] It is important to note that plaintiff's response to defendant's proposed undisputed facts was inadequate. Contrary to the explicit instructions listed in Local Rule 56 and the Rule 16(b) Scheduling Order, plaintiff's brief in opposition did not "include a separately captioned section *within the brief* addressing … each of the movant's enumerated facts." (Doc. 11) (emphasis added). Instead, plaintiff filed a separate exhibit containing responses to each fact proposed by defendant. But in addition, the responses are inadequate; plaintiff often admitts a proposed fact, but then purports to raise a disputed fact by indicating that defendant's proposed fact was incomplete or misleading without citing any record evidence contrary to defendant's asserted fact. This response does not suffice to raise a dispute of material fact. In accordance with Local Rule 56 and the Rule 16(b) Scheduling Order, "[t]he Court may assume that a fact identified by the movant as undisputed in the movant's brief that is not specifically controverted in the non-movant's brief" with "appropriate citations to the record … is admitted for the purpose of deciding the motion for summary judgment." (Doc. 11).

(iii) supporting business development efforts. Pl. Dep. at 60-61, 67-72; Haug Dep. at 20; Haug Dec. ¶ 5. Plaintiff's duties also included, in his words, some "not very exciting work" and "[f]airly mundane work," such as reviewing orders for break room snacks. Pl. Dep. at 73, 115-16; Haug Dep. at 21. Gradually, however, plaintiff transitioned into the business development role in M&S for which he was originally hired. Pl. Dep. at 240-44; Haug Dec. ¶ 7.

5. When defendant acquired Potomac Fusion, management identified the key Potomac Fusion employees and entered into retention bonus agreements with them. Plaintiff was not included in this list because he was not deemed critical to the strategic growth of the company or to add significant value. Haug Dec. ¶ 5.

6. Defendant has two general types of employees: direct and indirect. Direct employees work on specific government contracts, and their wages are billable, meaning they are effectively paid directly by government funding on a particular contract. Indirect employees work as managers and staff employees and are paid out of the company's overhead, which is funded by the overhead fees charged to the government. At all times during plaintiff's employment, plaintiff was an indirect employee. Haug Dec. ¶ 5; Pl. Dep. at 49; Haug Dep. at 19-20.

7. In September 2012, the Army named defendant as a prime contractor for SSES NexGen ("NexGen"), which developed war fighting software for the Army at Aberdeen Providing Ground in Maryland. Pl. Dep. at 62, 108, 159-60; Haug Dep. at 35-36; Dec. of Kathleen Lossau ("Lossau Dec.") ¶ 4.

8. NexGen was an "indefinite delivery, indefinite quantity" ("IDIQ") contract. A contractor who wins an IDIQ contract does not win any government funding and is not awarded any contracts for specific projects; an IDIQ contract merely gives contractors the right to bid on future task orders the government might issue under that contract. Pl. Dep. at 25-46; Dep. of Devin Edwards ("Edwards Dep.") at 58; Lossau Dec. ¶ 4. A program manager of an IDIQ contract has no clients, funding, or staff, and his salary is an overhead expense to the company until tasks have been won. Pl. Dep. at 153, 186.

9. In early October 2012, Haug and Vice President Kathleen Lossau asked plaintiff to be the NexGen IDIQ Program Manager ("PM"), and plaintiff agreed in return for a substantial pay raise. The job duties included business development and once the project began, would include coordination with subcontractors. Because the project was delayed, plaintiff focused on business development during the short time he worked on NexGen. Plaintiff had no employees reporting to him in this role. In essence, because there were no task orders associated with the NexGen IDIQ, plaintiff's job was a business development job, which would be billed as an overhead expense. Pl. Dep. at 108, 152-53, 155-57, 160, 178-79, 271; Haug Dep. at 38, 98-100; Edwards Dep. at 68; Lossau Dec. ¶ 4.

10. On October 17, 2012, just a few days after transferring into the NexGen PM role, plaintiff fell off his roof and severed his hand. Plaintiff was hospitalized for several days and subsequently required two to three days of physical therapy per week in November and December 2012 and beyond. Plaintiff's physician indicated that plaintiff would miss work from October 17, 2012, until December 31, 2012. Pl. Dep. at 184, 195-96, 198, 201, 204-05, 219; Haug Dep. 48.

11. Plaintiff informed Haug of the injury the day it occurred, and defendant was aware that plaintiff would be away from work while he recovered. After receiving approval for short term disability leave, plaintiff took medical leave in the form of paid time off and short term disability, which paid part of his salary while he was on leave. Although plaintiff offered to perform some of his job duties while on leave, he was advised to stay home and heal. Pl. Dep. at 195-96, 199, 216-18; Haug Dep. at 50.

12. Plaintiff also communicated with Lossau about NexGen several times while plaintiff was on medical leave. Lossau Dec. ¶ 6; Lossau Dec. Ex. A.

13. During plaintiff's leave, Devin Edwards, who was Director of Mission Analytics and Collection, assumed responsibility over the NexGen IDIQ and maintained it as an area of responsibility after plaintiff returned to work in January 2013. Haug told Edwards that "[t]here's nothing for you to do right now" on the NexGen IDIQ because the project had not begun and there were no task orders. Edwards continued to perform his many other business duties, devoting only 10 to 20 percent of his time to NexGen, as no task orders were issued for the project in 2012 or 2013. In all, Edwards managed nine other activities for defendant outside of NexGen. Pl. Dep. at 208-10, 229, 273; Haug Dep. at 77, 106-08; Haug Dec. ¶¶ 9, 10; Edwards Dep. at 46, 56, 66-68, 77-78.

14. In November 2012, through a series of emails, Lossau explained to plaintiff that it was critical that Edwards assumed the NexGen program manager responsibilities because it was unclear how long plaintiff would be out and plaintiff would miss the government's "kickoff meeting" and preliminary work that preceded that meeting. Lossau Dec. ¶ 7; Lossau Dec. Ex. B.

15. In October 2012, while plaintiff was on leave, a government sequestration was announced. Sequestration halted the fulfillment of most government contracts, and during the sequestration period, no funding was available for task orders. With respect to the NexGen project, it became clear that the project would be delayed for several months as there was no money to fund task orders. Pl. Dep. at 230-31, 276; Haug Dep. at 105-07, Haug Dec. ¶¶ 8, 10.

16. After government sequestration was announced, defendant posted a Frequently Asked Questions ("FAQ") webpage that states: (i) that defendant "will likely be impacted in some way by sequestration," (ii) that defendant's "leadership team [has] very deliberately positioned the company in the right places over the past

few years to inoculate [defendant] from the inevitable return to 'peacetime' defense spending levels," (iii) that "[a]t this time we do not know the level of impact to [defendant]," and (iv) that furloughs could affect some employees. Pl. Ex. 42, Sotera FAQ.

17. As a result of government sequestration, defendant was not awarded any task orders associated with the NexGen project during 2013. Defendant did not win its first task order on the project until June 2014. Pl. Dep. at 276; Haug Dep. at 106-07; Haug Dec. ¶ 10; Lossau Dec. ¶ 8.

18. On or about December 26, 2012, Haug told plaintiff that when he returned, plaintiff would report to Vice President Jim Gerard in a new Electronic Warfare Program ("EWP") and M&S division. On December 31, 2012, Haug emailed plaintiff and Gerard and confirmed that plaintiff would report to Gerard. The focus of the M&S division was business development planning in M&S. Pl. Dep. at 143-54, 227-28; Haug Dep. at 60-61; Haug Dec. ¶ 7, 12; Haug Dec. Ex. D; Lossau Dec. ¶ 9.

19. Plaintiff was assigned to work on an electronic warfare program management trainer ("EWPMT") proposal because he had a background in M&S. In fact, plaintiff was an elected member of a group that organized a regular semiannual M&S conference, which plaintiff had attended for years. One of plaintiff's new duties was to develop business for the M&S division by developing his network of M&S contacts in the defense community. Pl. Dep. at 235-38; 240-45.

20. On December 31, 2012, in an email to Haug, plaintiff indicated that he was "excited about diving into this" and thanked Haug for "carving out a new role for [him]" as he returned to work. Plaintiff spent a significant amount of time helping to write a proposal for EWPMT that was submitted in early February 2012. Haug Dec. ¶ 11, 12; Haug Dec. Ex. D.

21. In his new EWP/M&S position, plaintiff was paid the same salary and benefits that he was paid in his NexGen PM role. In addition, plaintiff engaged in business development and reported to a vice president, just as he did in his previous role. In essence, the nature of the work was the same. Pl. Dep. at 235-38; 240-45, 268-69, 271; Haug Dec. ¶ 11, 12.

22. In 2012, defendant experienced financial difficulty. Defendant's forecasted revenue for Fiscal Year 2012 was $469 million, but because of government sequestration, defendant's actual revenue for Fiscal Year 2012 was only $359 million. As a result of the decline in profits, defendant failed to meet the minimum required by the covenants for defendant's loan agreements. Pl. Dep. at 266; Haug Dec. ¶ 12; Dec. of Jennifer Felix ("Felix Dec."), ¶¶ 6, 7.

23. By January 2013, defendant decided to cut costs in order to avoid violating its loan covenants by cutting layers of overhead, particularly in the DFA business

unit, which had the most overhead of any division of the company and was underperforming. This resulted in rolling layoffs that began in 2013 and continued throughout 2014. Pl. Dep. 266-268; Haug Dec. ¶¶ 12-14; Felix Dec. ¶¶ 4, 8, 9.

24. In February 2013, as part of cutting overhead costs, Haug made the decision—with input from Lossau, Senior Vice President Bill Cave, and Senior Vice President and Head of H.R. Lisa Broome—to lay off plaintiff, on the grounds that plaintiff was not performing any direct billable work and the DFA's other projects were deemed to be a higher priority than the M&S and EWPMT initiatives on which plaintiff was working. Pl. Dep. 266, 268; Haug Dep. 62-65; Haug Dec. ¶ 13, 14; Felix Dec. ¶ 10.

25. Haug decided not to lay off Edwards, despite the fact that NexGen was stalled at the time, because Edwards was critical to a number of defendant's other significant revenue programs. In fact, Edwards was named project manager of the year in 2013. Haug Dec. ¶ 14.

26. Haug, as Vice President of the DFA division, began 2013 with 25 management overhead and indirect positions reporting to him, including plaintiff. Thereafter, as part of the series of rolling layoffs, Haug laid off plaintiff and numerous director and senior director employees, along with Vice President Gerard. All of the laid off managers, including plaintiff, were laid off due to lack of business to support their overhead costs. Other managers voluntarily resigned due to the financial condition of the company and were not replaced with new hires. By November 2013, only 11 senior managers remained from the group of 25 that had commenced the year. Of the 250 employees who originally came from Potomac Fusion, Haug estimates that fewer than 50 remain employed by defendant. In November 2014, Haug himself chose to resign in lieu of being laid off pursuant to the reduction in force ("RIF"). Pl. Dep. at 267-68; Haug Dec. ¶¶ 3, 15, 16.

## II.

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *See id.* at 325. Where evidence is lacking as to even one element of the plaintiff's case, there can be no genuine issue of material fact "since a complete failure of proof concerning an essential element

of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 322. To defeat a motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (quoting Fed. R. Civ. P. 56(e)). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). An issue of material fact is genuine when "the evidence … create[s] [a] fair doubt; wholly speculative assertions will not suffice." *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.

Analysis properly begins by considering the FMLA rights afforded to employees who take medical leave and whether defendant interfered with those rights. The FMLA grants employees the right to take up "to a total of 12 workweeks of leave during any 12-month period" when an employee is burdened with "a serious health condition that makes the employee unable to perform" his job. 29 U.S.C. § 2612(a)(1)(D). When an employee returns from FMLA leave, he is entitled:

> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
>
> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1). Importantly, there is "no absolute right to restoration to a prior employment position." *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 549 (4th Cir. 2006). An employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 2614(a)(3). The FMLA further provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's FMLA rights. 29 U.S.C. § 2615(a)(1). To establish an FMLA interference claim, an employee must "demonstrate that (1) he [was] entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that the interference caused harm." *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015).

Here, the parties do not dispute that plaintiff was entitled to an FMLA benefit. At issue is whether plaintiff has adduced competent record evidence sufficient to raise a genuine issue of material fact that defendant interfered with the provision of plaintiff's FMLA benefit to the detriment of plaintiff by: (i) not restoring plaintiff to his former position after FMLA leave; (ii) not restoring plaintiff to an equivalent position after FMLA medical leave; or (iii) terminating plaintiff from his new position six weeks after FMLA leave. Each theory of interference is addressed separately.

## A.

Analysis next properly focuses on the scope of the § 2614(a)(1) right to be restored to a previous or equivalent position, which is central to plaintiff's first theory of interference. Plaintiff contends that § 2614 requires an employer to restore an employee to his prior position if that position still exists and that because defendant did not restore plaintiff to his former NexGen PM position after plaintiff returned from FMLA leave, defendant interfered with plaintiff's

8

FMLA right. Plaintiff's argument fails, as it rests on an incorrect reading of § 2614(a)(1), a reading that contravenes the statute's plain meaning.

Plaintiff argues that § 2614(a)(1) should be interpreted to allow an employer to restore an employee to an equivalent position *only if* the employee's former position no longer exists. This reading of the statute is incorrect; it is flatly contradicted by the statute's plain language. The statute states that an employer has a choice to restore an employee "to the position of employment held by the employee when the leave commenced; *or* ... to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1) (emphasis added). Thus, the statute makes clear that an employer has the option of restoring an employee returning from FMLA leave to the employee's previous position or an equivalent position. Nothing in the text indicates that the first option must be exhausted before the second becomes available.[3] Moreover, the Fourth Circuit has never construed the statute in the manner plaintiff proposes; to the contrary, the Fourth Circuit has made clear that there is "no absolute right to restoration to a prior employment position." *Yashenko*, 446 F.3d at 549. The Fourth Circuit has further elucidated that "[t]he FMLA allows an employee who takes qualifying leave to be restored *either* to his original, pre-leave position *or* to 'an equivalent

---

[3] Moreover, it is worth noting that plaintiff's construction is further flawed because it would sometimes "give employees on FMLA leave greater rights than those provided to employees not on leave, ... an outcome wholly inconsistent with the purposes and goals of the FMLA." *Yashenko*, 446 F.3d at 548. For example, an employer may need to shift employees around or reduce a full-time position to a part-time position for reasons unrelated to any particular employee's FMLA leave. Under plaintiff's construction, an employee who did not take leave would have no recourse for such actions, but an employee returning from FMLA leave would be entitled to be restored to his previous position, even if that means the employer must undo the actions taken that were unrelated to the employee's FMLA leave. This outcome is expressly prohibited by the FMLA. *See* 29 U.S.C. § 2614(a)(3) ("Nothing in this section shall be construed to entitle any restored employee to ... any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken leave.").

position.' " *Csicsmann v. Sallada*, 211 F. App'x 163, 166 (4th Cir. 2006) (quoting 29 U.S.C. § 2614(a)(1)) (emphasis added). Although the Fourth Circuit has not squarely addressed the theory of interpretation advanced by plaintiff, other courts have flatly rejected that interpretation.[4]

Plaintiff cites only one district court case—*Weth v. O'Leary*—in support of his interpretation of the FMLA. 796 F.Supp.2d 766 (E.D. Va. 2011). Plaintiff's reliance on this case is mistaken, as it does not support the proposition that § 2614(a)(1) allows employers to restore an employee returning from FMLA leave to an equivalent position *only if* the employee's former position no longer exists. In *Weth*, the district court actually held that the plaintiff's interference claim survived summary judgment when an employer terminated an employee upon his return from FMLA leave, even though the employee's prior position still existed. *Id.* at 779. Importantly, the employer in *Weth* neither restored the employee to a prior position nor restored the employee to an equivalent position. *Id.* Indeed, unlike here, the employer in *Weth* did not restore the plaintiff to a different position, and hence the district court did not address whether the employer could restore the employee to an equivalent position rather than the employee's prior position. Thus, contrary to plaintiff's contention, *Weth* neither addressed nor approved the argument plaintiff makes here; *Weth* does not stand for the proposition that pursuant to § 2614(a)(1), an employer must return an employee to his prior position—not an equivalent

---

[4] *See e.g.*, *Lafortune v. Fiber Materials, Inc.*, No. 03-275-P-H, 2004 WL 2378861, at *4 (D. Me. Oct. 25, 2004) ("In this case, the plaintiff was not restored by the defendant to his pre-leave position ... . The statute expresses no preference for restoration to the original position; all that an employer need do is to provide an equivalent position."); *Walker v. Putnam Cnty., Ga.*, No. 5:08-CV-00452, 2010 WL 3732111, at *13 (M.D. Ga. Sept. 14, 2010) (explaining that plaintiff had "no absolute right to reinstatement ... . because [d]efendants offered him an equivalent position"); *Green v. New Balance Athletic Shoe, Inc.*, 182 F.Supp.2d 128, 136 (D.Me.2002) (the position an employee returns to "need not be the same position the employee held before she took leave"); *Reza v. IGT*, No. 3:06-CV-00211-BESVPC, 2007 WL 6942286, at *5 (D. Nev. Oct. 31, 2007) (explaining that the offer of an equivalent position would not be in violation of the FMLA and granting summary judgment to the employer where the employee's original position had been eliminated for work-related reasons while she was on leave).

position—if the prior position still exists. If anything, *Weth* suggests the opposite, as the district court stated explicitly that an employer could "restore [an employee] to the same or an equivalent position." *Id.* at 778.

In sum, plaintiff's construction of § 2614(a)(1) is wholly unpersuasive. Pursuant to § 2614(a), a defendant is required to restore plaintiff to *either* the same position *or* an equivalent position; plaintiff is not entitled to one option over the other. Here, defendant could not restore plaintiff to his pre-leave position because, when plaintiff returned from FMLA leave, the NexGen PM position was no longer a full-time position, as there were no task orders for NexGen. Instead, defendant restored plaintiff to a different position. Thus, to survive summary judgment plaintiff must show that there is a genuine issue of material fact as to whether the new position was an equivalent position.

**B.**

Analysis next properly considers whether the position to which plaintiff was restored after taking FMLA leave was an equivalent position pursuant to § 2614(a)(1). Contrary to plaintiff's contention, the undisputed record evidence confirms that no reasonable juror could find that the position to which plaintiff was restored after taking FMLA leave was not equivalent to his prior position.

For the purposes of the FMLA, "an equivalent position" is "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, prerequisites and status," that "involve[s] the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215. Importantly, "the requirement of equivalent terms and conditions of employment 'does not extend to de minimis or intangible, unmeasurable aspects of

11

the job.' " *Csicsmann*, 211 F. App'x at 166 (4th Cir. 2006) (quoting 29 C.F.R. § 825.215). The

Fourth Circuit's decision in *Csicsmann* is instructive here. The plaintiff in *Csicsmann* was

assigned to a new position after returning from FMLA leave. *Id.* at 165. The plaintiff argued that

the new position was not equivalent to his previous job because "his new position was less

prestigious and had different responsibilities than the old one." *Id.* The district court rejected that

plaintiff's claim, granting the employer summary judgment. *Id.* The Fourth Circuit affirmed

summary judgment for the employer, holding that the plaintiff's new position was equivalent

because he had the same "salary, title, bonus eligibility, health care, and retirement benefits,"

even though his job responsibilities differed. *Id.* at 165-66. The Fourth Circuit further held that

the plaintiff's allegations that the new position was less prestigious and less visible "[were] the

very intangible aspects of the position appropriately excluded from an equivalency

determination." *Id.* at 166.

Here, there is no genuine issue of material fact as to whether the tangible aspects of the

EWP/M&S position to which plaintiff was restored were equivalent to those of plaintiff's former

position. In all material and significant respects, the two positions were the same: (i) both

positions paid the same salary and benefits, Pl. Dep. at 268-69, 271; Haug Dec. ¶ 12; (ii) both

positions were senior director positions that required plaintiff to report to a vice president, Pl.

Dep. at 268-69, 271; Haug Dec. ¶ 12; (iii) neither position included significant managerial

responsibilities;[5] and (iv) in both positions, plaintiff was an indirect employee, whose work could

---

[5] There is a minor dispute on this point. Defendant presents factual evidence that in plaintiff's new position, plaintiff supervised Dennis Mitchell. Haug Dec. ¶ 12. Plaintiff contends that plaintiff did not supervise anyone in his new position, just as plaintiff did not supervise anyone in his former position. Pl. Opp. at 19. Ultimately, this dispute is not material and resolution would make no difference to the result reached here. If plaintiff is correct, then the two positions are similar for still another reason. If defendant is correct, then plaintiff's new position is arguably more prestigious insofar as it would allow plaintiff to supervise an employee.

not be billed directly to the government, Haug Dec. ¶ 5. Pl. Dep. at 49; Haug Dep. at 19-20. Most importantly, plaintiff's primary responsibility in both positions was business development, a responsibility for which plaintiff was well-suited given his past experience.[6] Plaintiff's post-leave assignment to do business development in the EWP/M&S position was equivalent to his pre-leave work.[7]

Plaintiff argues that there are several differences between the two positions, but each of these proffered differences are either not differences at all or are de minimis, and are therefore insufficient. Plaintiff first argues that the EWP/M&S position was less important than the NexGen PM position because defendant never issued a press release in relation to the EWP/M&S position, whereas with respect to the NexGen PM position, defendant did issue a press release. This argument fails under *Csicsmann*, as it is an argument about prestige, which is a de minimis difference. 211 F. App'x at 166. Plaintiff also argues that the EWP/M&S position had "no budget, no clients, [and] no billable work." Pl. Opp. at 18. But during the relevant time period, the NexGen project also had no budget, no clients, and no billable work. Both were business development roles that required plaintiff to generate clients and billable hours. Plaintiff further notes that although he continued to work from the same office after FMLA leave, his new boss lived in a different city. Given that courts have held that an *employee's* new travel habits in

---

[6] Prior to being assigned to NexGen, plaintiff had done business development work for defendant, and because the NexGen project was delayed, plaintiff focused on business development during the short period in which he worked on NexGen. Pl. Dep at 240-44; Haug Dep. at 98-100; Haug Dec. ¶ 7. Indeed, business development was one of plaintiff's primary qualifications at the time he was hired, as plaintiff had many contacts in the M&S community and regularly attended semiannual M&S conferences. Pl. Dep. at 235-38; 240-42.

[7] Although not dispositive, it is also worth noting that when defendant assigned plaintiff to his post-leave position, plaintiff was pleased. Specifically, on December 31, 2012, plaintiff indicated in an email to Haug that he was "excited about diving into this" and thanked Haug for "carving out a new role for [him]" as he returned to work. Haug Dec. ¶ 12; Haug Dec. Ex. D.

a new post-leave position are de minimis differences,[8] the geographic location of *a boss* is clearly a de minimis difference and not a basis for concluding that the positions are not equivalent.

Plaintiff also points out that there was no formal job description regarding the EWP/M&S position. Yet, neither was there a formal job description for the NexGen PM job; the only description of duties in evidence that relates to the NexGen PM job is an action item list that was created by plaintiff and an unauthenticated document labeled "PM Duties." *See* Pl. Ex. 52, Waag Action Item List; Pl. Ex. 13, PM Duties. Plaintiff contends that the action item list, which plaintiff drafted on October 10, 2012, a week before plaintiff's injury, shows that the NexGen PM position required plaintiff to perform many tasks beyond business development. *See* Pl. Ex. 52, Waag Action Item List. The unauthenticated document lists a PM's general duties as including, in addition to business development duties, responsibilities related to proposal management and program management. Pl. Ex. 13, PM Duties. Not only are these documents not formal descriptions of the NexGen PM position, they also do not describe what duties *were actually* performed in that role. Rather, the documents describe the duties that plaintiff would have had as the NexGen PM *if, as had not yet occurred, the government awarded task orders to defendant for the NexGen project*. Because lack of government funding delayed the project, however, no task orders were awarded prior to plaintiff's termination; indeed, defendant was not awarded a task order for the NexGen project until 2014.[9] As a consequence, plaintiff's role

---

[8] *See, e.g., Smith v. East Baton Rouge Parish School Board*, 453 F.3d 650, 652 (5th Cir. 2006) (holding that reduction in travel was a de minimis difference); *Hillstrom v. Best Western TLC Hotel*, 265 F.Supp.2d 117, 126-27 (D. Mass. 2003) (holding that loss of private office and change of reporting line were de minimis differences).

[9] Plaintiff also points to the SSES NexGen project duties and tasks that were posted to the company's website and the planned task order awards that the government outlined in its

before the injury—and the role that Edwards assumed during and after plaintiff's leave—was a business development role. This is the same type of role that plaintiff filled after he returned from FMLA leave; the only difference was that the first position was under one contract and the second position was under another.

It is important to keep in mind that the context in which defendant's business operated changed rapidly due to government sequestration during and after plaintiff's FMLA leave. As a result, defendant's needs changed. Plaintiff's former full-time position had evolved into a small scope of responsibilities that did not require a full-time employee; indeed, these responsibilities were easily covered by an employee—Edwards—with many other responsibilities; in fact, Edwards spent only 10 to 20 percent of his time on the NexGen PM duties. Edwards Dep. at 66-68, 77-78, 106-108. Rather than restore plaintiff to his former position, which had shrunk to a part-time role, defendant placed him in the full-time EWP/M&S position. In all material and significant respects, the new position was equivalent to plaintiff's former position. Both positions were senior director jobs with the same salary and benefits, and the same business development responsibilities. Although there are some de minimis differences, no reasonable juror could find that the positions were tangibly different.

---

December 4-6, 2012 Advance Planning Briefing for Industry ("APBI"). Pl. Ex.10, Press Release; Pl. Ex. 36, APBI re SSES NexGen Award of Task Orders. But these documents are not evidence that the NexGen PM position did *in fact* include duties beyond business development during and after plaintiff's medical leave; they merely indicate that *if task orders were awarded*, the NexGen PM would have responsibilities beyond business development. Similarly, the slides from defendant's DFA Business Unit Reviews, read in the light most favorable to plaintiff, show only that there was business development work to do in pursuing task orders on the SSES NexGen project; they do not show that the NexGen PM had any duties beyond business development during the relevant time period, namely the period from when plaintiff returned from FMLA leave to when plaintiff was terminated. *See* Pl. Ex. 55, Feb. 2013 DFA Bus. Unit Review, SDS004658; Pl. Ex. 58, March 2013 DFA Bus. Unit Review, SDS004598.

## C.

Analysis next properly considers whether defendant interfered with plaintiff's FMLA right to restoration by terminating plaintiff a few months after plaintiff returned from medical leave. Plaintiff argues that defendant's numerous layoffs were a pretext for its unlawful termination of plaintiff. In his opposition to defendant's motion for summary judgment, plaintiff presents this argument as both: (i) an independent theory of FMLA interference, and (ii) a theory of retaliation/discrimination. Yet, plaintiff fails to raise a genuine issue of material fact under either theory. Each theory is addressed separately.

### 1. Interference theory

The Fourth Circuit has made clear that "[t]he FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." *Laing v. Fed Express Corp.*, 703 F.3d 713, 723 (4th Cir. 2013). In fact, "[t]he FMLA ... provides that '[n]othing in this section shall be construed to entitle any restored employee to ... any right, benefit, or position of employment other than [one] to which the employee would have been entitled had the employee not taken leave." *Id.* (quoting 29 U.S.C. § 2614(a)(2)(B)). In *Yashenko* the plaintiff took medical leave, and while he was out, his employer reorganized and eliminated his position. 446 F.3d at 545. Consequently, the plaintiff's employment was terminated when he returned from FMLA leave. *Id.* The Fourth Circuit affirmed summary judgment for the employer and held that the plaintiff did not have an absolute right to return to work because his employment would have been terminated even had he not taken leave. *Id.* at 548-50. In this respect, the Fourth Circuit made clear that "an employer may deny restoration when it can show that it would have discharged the employee in any event regardless of the leave." *Id.* at 548.

16

Here, plaintiff's interference claim fails because the undisputed record evidence reflects that no reasonable juror could find that plaintiff's termination was linked to his FMLA leave. Similar to *Yashenko*, plaintiff's layoff was inevitable irrespective of FMLA leave. Defendant has presented overwhelming evidence—which plaintiff is unable to dispute—that defendant was in poor financial condition when plaintiff was terminated in February 2013. Defendant utilized a RIF to eliminate overhead costs—specifically, indirect employees who could not be billed directly to the government. Plaintiff was never a direct employee, and would have been laid off regardless of his FMLA leave. The RIF that began in 2013 and continued in 2014 was so extensive that by November 2013, 14 of 25 senior managers had been laid off. Haug Dec. ¶¶ 15, 16. Even Haug, the founder of the DFA division, and the decision-maker in plaintiff's layoff, ultimately resigned in 2014 rather than allow himself to be laid off. Haug Dec. ¶ 3.

Plaintiff argues that there is a genuine issue of material fact as to whether defendant was, in fact, in poor financial condition due to the sequestration. Specifically, plaintiff points to the FAQ document that was created by defendant around the same time as plaintiff's termination; the document says that "[defendant's] leadership team [has] very deliberately positioned the company in the right places over the past few years to inoculate ourselves from the inevitable return to 'peacetime' defense spending levels." Pl. Ex. 42, Sotera FAQ. But this quote falls far short of establishing a genuine dispute of material fact as to whether defendant was experiencing financial difficulty as a result of sequestration. To begin with, the undisputed record evidence clearly reflects that defendant experienced financial difficulty in 2012 and 2013. Defendant's forecasted revenue for Fiscal Year 2012 was $469 million, but because of government sequestration, defendant's actual revenue for Fiscal Year 2012 was only $359 million. Haug Dec. ¶ 12; Felix Dec. ¶¶ 6, 7. As a result, in January 2013, defendant cut layers of overhead,

particularly in the DFA business unit, which had the most overhead of any division of the company and was underperforming. Haug Dec. ¶¶ 12-14; Felix Dec. ¶¶ 4, 8, 9. This resulted in rolling layoffs that began in 2013 and continued throughout 2014. Haug Dec. ¶¶ 3, 15, 16. In addition, plaintiff plucks the FAQ quote from its context, ignoring other portions of the FAQ document. Immediately before the quoted text, the FAQ document says "[defendant] will likely be impacted in some ways by sequestration," and immediately after the text that plaintiff quotes, the FAQ document says that "[a]t this time we do not know the level of impact to [defendant]." *Id.* The FAQ document also indicates that furloughs would affect some employees. *Id.* Thus, in light of its context, the excerpt quoted by plaintiff does not raise a genuine issue of material fact regarding whether defendant was experiencing financial difficulties in 2012 and 2013 and that this was the basis for the numerous layoffs, including plaintiff's.

Plaintiff also contends that if plaintiff had remained in the NexGen PM position he would not have been laid off, pointing to the fact that defendant did not discharge Edwards, who took over plaintiff's NexGen PM responsibilities. Importantly, however, the NexGen PM assignment was only a small fraction—10 to 20 percent—of Edwards's work responsibilities; indeed, because the NexGen project had been significantly delayed, Edwards was able to manage nine other activities simultaneously. Haug Dep. at 77, 106-08; Haug Dec. ¶¶ 9, 10; Edwards Dep. at 46, 56, 66-68, 77-78. Thus, the fact that Edwards was not discharged does not create an issue of material fact; no reasonable juror could find on this record that plaintiff would not have been laid off had he not taken FMLA leave and remained in the NexGen PM position.

Plaintiff also provides evidence that on March 18, 2013, only a few weeks after plaintiff was terminated, defendant hired Joseph Koch as a senior director who would be Deputy leader of defendant's DFA division. *See* Waag Dec. ¶ 55; Pl. Ex. 58, Sotera Doc. SDS004587; Pl Ex. Ex.

63, Sotera Doc. SDS000187. But plaintiff provides no evidence about the purpose of this hire, the nature of the job, or whether plaintiff was capable of performing the new hire's duties. Moreover, a single hire in the face of dozens of layoffs does not raise a genuine issue of material fact given the mountain of evidence that establishes defendant's poor financial condition.

In sum, plaintiff's interference claim fails because there is no genuine issue of material fact as to whether plaintiff's termination was linked to his FMLA leave.

**2. Retaliation/Discrimination Theory**

Plaintiff also casts his termination argument in terms of a retaliation/discrimination theory. This alternative presentation of the same facts, however, fares no better than the interference theory.

As the Fourth Circuit has explained, FMLA retaliation claims are analyzed under the "burden-shifting framework" of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–06 (1973). Therefore, to succeed on "[a] retaliation claim, [plaintiff] must first make a prima facie showing that he engaged in protected activity, that the employer took adverse action against [him], and that the adverse action was causally connected to the [plaintiff's] protected activity. If he puts forth sufficient evidence to establish a prima facie case of retaliation and [defendant] offers a non-discriminatory explanation for [plaintiff's] termination, [plaintiff] bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Yashenko*, 446 F.3d at 551 (4th Cir. 2006) (internal quotations and citations omitted). Although the burden of production in a retaliation case may shift, the burden of persuasion "remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000) (quotations and citation omitted).

Here, even assuming that plaintiff can establish a prima facie case of retaliation/discrimination, defendant has met its burden of establishing a legitimate non-discriminatory reason for the termination, namely the financial hardship already described and the stated reasons for plaintiff's discharge. *See* Haug Dep. 62-65; Haug Dec. ¶ 13, 14; Felix Dec. ¶ 10. Thus, to survive summary judgment, plaintiff must show that there is a genuine issue of material fact that the dozens of layoffs were a pretext and that the discharge resulted instead from some improper purpose. This, plaintiff has failed to do.

Plaintiff's theory of pretext rests primarily on an unreasonable interpretation of a single email. Specifically, plaintiff misconstrues an email from Lossau to Haug as evidence that the EWP/M&S job was created as a sham in an effort to conceal the fact that Lossau had already decided to terminate Waag in October 2012. *See* Pl. Ex 53, SDS004729. Yet, contrary to plaintiff's contention, the email provides no basis for a theory of retaliation or discrimination. The email states:

> I spoke with [plaintiff] tonight.
>
> He will be on short term disability until mid dec (earliest) and January more likely.
>
> I need a new PM for SSES nexgen… Thoughts???

*Id.* Contrary to plaintiff's suggestion, no reasonable juror could interpret this email as indicating that defendant had already decided that plaintiff would be discharged. Rather, upon learning that plaintiff would be unable to work for several months, Lossau quite reasonably stated simply that someone needs to fill the NexGen PM role. The email does not address whether the replacement would be temporary or permanent, and the email certainly makes no indication that plaintiff will be discharged. In short, the email creates no genuine issue of material of fact that defendant had an improper purpose in discharging plaintiff. Thus, summary judgment is appropriate on

plaintiff's retaliation/discrimination theory because there is no genuine issue of material fact as to whether defendant's legitimate non-discriminatory reason for discharging plaintiff—the RIF layoff—was pretextual.

## IV.

Plaintiff has filed a Rule 15 motion for leave to amend the complaint in order to conform the complaint to the evidence (Doc. 45). Specifically, plaintiff relies on Lossau's email to argue that plaintiff should be entitled to amend the complaint to include a retaliation/discrimination claim. *See* Pl. Ex 53, SDS004729. Leave to amend in this regard is both unnecessary and futile. It is unnecessary because plaintiff in his opposition to defendant's motion for summary judgment argued both the already pled interference claim and the retaliation/discrimination claim, relying in part on Lossau's email. The email was produced in discovery and was relied on by plaintiff in his opposition to summary judgment. Moreover, the analysis here on summary judgment has addressed both of plaintiff's claims: (i) the interference claim and (ii) the retaliation/discrimination claim. Thus, amending the complaint is completely unnecessary.

Moreover, an amendment would be futile, as the analysis demonstrates that summary judgment would be appropriate as to both the interference claim and the retaliation/discrimination claim. In this respect, the Supreme Court has made clear that leave to amend should generally be "freely given" in "the absence of any apparent or declared reason— such as undue delay, … undue prejudice … , futility of the amendment etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, an amended complaint would be futile. As already discussed, plaintiff's discrimination/retaliation theory fails because, even if plaintiff could make a prima facie case of discrimination/retaliation, plaintiff is unable to raise a genuine issue of material fact

that defendant's proffered legitimate non-discriminatory reason for terminating plaintiff was pretextual.

In sum, plaintiff's motion to amend the complaint to include a retaliation/discrimination claim is appropriately denied because it is unnecessary and futile.

**V.**

For the reasons stated here, and for good cause,

It is hereby **ORDERED** that defendant's motion for summary judgment (Doc. 28) is **GRANTED**.

It is further **ORDERED** that plaintiff's motion for leave to amend his complaint (Doc. 45) is **DENIED AS FUTILE**.

It is further **ORDERED** that defendant's motion to strike plaintiff's opposition to defendant's motion for summary judgment (Doc. 50) is **DENIED AS MOOT**.

It is further **ORDERED** that plaintiff's motion for leave to file amended witness and exhibit lists (Doc. 66) is **DENIED AS MOOT**.

The Clerk is **DIRECTED** to enter judgment in favor of defendant, pursuant to Rule 58, Fed. R. Civ. P.

The Clerk is directed to send a copy of this Order to all counsel of record and to place this matter among the ended causes.

Alexandria, VA
November 5, 2015

/s/

T. S. Ellis, III
United States District Judge

22